UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X
JOHN EDD BROWN

      Plaintiff,                    <u>MEMORANDUM AND ORDER</u>

   -against-                         Civil Action No.
                                    CV-03-6166 (DGT)
ASTRAZENECA PHARMACEUTICALS, L.P.
and DEIDRE GRAYSON

      Defendants.

--------------------------------X

Trager, J:

    Plaintiff John Edd Brown brings this action against his
former employer, AstraZeneca Pharmaceuticals, L.P., and
individual AstraZeneca employee Deidre Grayson.  This action
arose from plaintiff's termination by AstraZeneca.  Plaintiff,
who is African-American, brings claims against AstraZeneca for
racial discrimination in violation of Title VII of the Civil
Rights Act of 1964 and intentional infliction of emotional
distress.  He brings a defamation claim against Deidre Grayson
for statements she made to AstraZeneca.

    Defendants have moved for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure.  For the reasons
stated below, defendants' motion for summary judgment is granted
on all claims.

## Background

Plaintiff began working as a Pharmaceutical Sales Specialist (PSS) for AstraZeneca in April, 1995. Pl.'s Aff. ¶ 1. AstraZeneca Regional Sales Manager (RSM) Jeff Cook hired plaintiff and then promoted him to District Sales Manager (DSM) in February, 2001. Pl.'s Dep. 69:11-16. As DSM, plaintiff supervised a "team" of PSSs responsible for promoting the company's products Nexium and Toprol-XL. Id. at 114:14-19.

Plaintiff claims he was subjected to several racial epithets while employed at AstraZeneca. After a 2001 management meeting, plaintiff was approached in the parking lot by a fellow DSM, John Crooks. Pl.'s Dep. 98:9-15, 101:15-21. Crooks, like plaintiff, is African-American. He had assisted plaintiff in securing the promotion to DSM and plaintiff considered him a friend. Id. at 64:6-65:20. Crooks told him that two particular PSSs on plaintiff's sales team felt that plaintiff was treating them unfairly because they were African-American. Id. at 91:22-92:20. Plaintiff contends that he was displeased with their performances, as compared to those of his other sales representatives, and would sometimes talk with the men about certain areas that needed improvement. Id. at 95:9-96:12.

Crooks then told plaintiff that the two PSSs called plaintiff an "Uncle Tom." Pl.'s Dep. 103:11-13. Plaintiff alleges that Crooks became very angry with him when he refused to

give preferential treatment to his African-American PSSs.  Pl.'s
Aff. ¶ 5.  Plaintiff also claims that Crooks frequently made
derogatory statements about Jewish people and co-workers whom he
believed to be homosexual.  Pl.'s Counter-Statement of Contested
Facts ¶ 3.

At his deposition, plaintiff remembered a second racial
epithet.  See Pl.'s Dep. 284: 17-24.  Defendant Deidre Grayson, a
PSS on his sales team, allegedly told plaintiff he was "nothing
more than a nigger with an MBA."  Id. at 284:23-24.  Grayson is
one-half African-American.  Id. at 282:6-22.  Plaintiff claims
Grayson is a "close personal friend" of Crooks.  Pl.'s Aff. ¶ 8.

Although plaintiff was offended by the incidents with Crooks
and Grayson, he did not file a complaint with AstraZeneca's Human
Resources (HR) department.  Pl.'s Dep. 287:24-288:9.  Plaintiff
contends that he has been dealing with racism all his life and
just "dealt with [the comments] because I felt I had to."  Pl.'s
Aff. ¶ 5.

Plaintiff claims he was an "exemplary" AstraZeneca employee,
as evidenced by his annual evaluation.  Compl. ¶ 2.  Plaintiff's
"Performance Evaluation" for 2001 took place on January 11, 2002.
See Pl.'s Ex. A.  AstraZeneca's Performance Evaluation forms list
four choices for an employee's "Overall Rating": "Distinguished,"
"Excellent," "Good" and "Unacceptable."  See id.  Plaintiff's
supervisor, Jeff Cook, gave him an Overall Rating of "Good:

3

Performance Met Overall Expectations." _Id._ Cook noted that plaintiff's performance "exceeded" expectations for six of the eleven listed goals and "met" expectations for the remaining five goals. _See id._ In his specific comments about plaintiff, Cook noted that plaintiff was "a pleasure to work with," but needed to work on his time management because "too many deadlines were not met in a timely manner." _Id._ Cook also commented that plaintiff should consult with him when "handling HR issues." _Id._

One of those "HR issues" soon arose. Grayson, one of the top sellers on plaintiff's sales team, expressed a desire to switch to another sales team. AstraZeneca was launching a new drug, Crestor, and this "new, sexier" drug presented the opportunity for greater prospective earnings for its sales representatives. _See_ Pl.'s Dep. 114:25-115:21. Grayson approached DSM Wendy Reed about transferring to the Crestor sales team. Plaintiff was insulted that Reed and Grayson discussed the transfer without first consulting him. Additionally, plaintiff believed that lateral transfers were against company policy, as such "jumping around . . . would create instability" within the company. _Id._ at 151:22-152:21. He informed Grayson of this policy and then discussed the situation with Cook, who confirmed AstraZeneca's policy on lateral transfers. Pl.'s Aff. ¶ 7.

Grayson, angered by plaintiff's response, met with Cook to discuss plaintiff's refusal to recommend her transfer. Pl.'s

Aff. ¶ 7. Both Grayson and Wendy Reed were upset with how plaintiff handled the transfer and Cook advised plaintiff that he should have behaved more diplomatically. Pl.'s Dep. 191:7-192:21. Cook maintains that he received many additional complaints about plaintiff from RSMs, DSMs and PSSs of all races. See Cook Dep. 63:19-25, 64:2-12, 71:20-72:21.

Cook became so concerned about plaintiff's managerial skills that, on June 4, 2002, he spoke with plaintiff about putting him on an "Action Plan." An Action Plan is a component of AstraZeneca's "Performance Improvement" program, which provides an opportunity for employees with unacceptable performance to better meet company expectations. See Pl.'s Ex. E. AstraZeneca describes an Action Plan as "written feedback to an employee on one or more areas of unacceptable performance, which may set a timetable for achievement of acceptable performance." Id.

Plaintiff felt his performance did not warrant placement on this program. Pl.'s Dep. 138:9-11. Based on his experience at the company, plaintiff claims that placement on an AstraZeneca Action Plan is "a mere euphemism for managing someone out of the company." Pl.'s Aff. ¶ 9. Cook countered this at his deposition. He claimed that numerous AstraZeneca employees who were once placed on Action Plans went on to be promoted. Cook Dep. 69:16-22. Plaintiff himself admits that he once placed a particular PSS on an Action Plan and the PSS successfully

completed the Plan without being terminated. Pl.'s Dep. 138:12-
14, 140:3-12.

Although Cook discussed an Action Plan with plaintiff, he
did not place plaintiff on one at that time. Pl.'s Dep. 137:25-
138:6. Six days later, however, plaintiff was suspended with pay
pending an investigation into allegations that he violated
AstraZeneca's antiviolence policy. See id. at 239:11-13. These
allegations were made by Grayson. She had filed a complaint with
Ann-Marie McGee in AstraZeneca's HR department and Cook, charging
plaintiff with "inappropriate touching, staring and threatening
behavior." Pl.'s Aff. ¶ 2. Grayson claimed that plaintiff
stared at her and routinely grabbed his subordinates' arms when
seeking their attention. Pl.'s Dep. 292:13-15, 295:25-296:14.
Plaintiff admits that Grayson and he once "look[ed] at each other
for a long time" to signal the conclusion of a "contentious"
meeting and that he routinely touched his co-workers' arms to
emphasize a point. Id. at 293:3-8, 298:8-12. He contends,
however, that Grayson only filed these charges because she
"mistakenly believed that [he] was standing in her way" of
switching to the Crestor sales team. Pl.'s Br. Opp'n Defs.' Mot.
Summ. J. at 5.

While suspended, plaintiff received AstraZeneca's "Sales
Value Proposition Award" for "Development." See Pl.'s Ex. B.
The $250 award was accompanied by a letter from Cook stating: "I

want to thank you for the hard work and dedication you have put
forth over the past year." Id.

AstraZeneca concluded its investigation two weeks later,
finding that plaintiff's conduct did not rise to the level
required to violate the company antiviolence policy. See Pl.'s
Dep. 239:15-22. Cook called plaintiff, telling plaintiff he was
cleared to return to work, but he would have to go on the Action
Plan they had previously discussed. Id. at 239:17-240:21.
Because plaintiff objected to being placed on the Action Plan,
Cook gave him the option of returning to the sales representative
position that he was originally hired for back in 1995, without
the Action Plan. See id. at 240:22-25. If he chose to return to
his current managerial position, however, he would be required to
go on the Action Plan. Id. at 241:2-5.

Plaintiff chose to return to his current DSM position and
arranged to meet with Cook on July 8, 2002. However, plaintiff
did not show up at the meeting. Pl.'s Dep. 242:14-17. When Cook
was able to locate him the next day, plaintiff informed Cook that
he would not return to work under the current conditions. Id. at
243:5-19. Plaintiff then asked Cook if he was required to attend
the upcoming national sales meeting. Id. at 244:21-24. Cook
consulted HR and his immediate supervisor, Marianne Jackson (Area
Sales Director for AstraZeneca). Cook told plaintiff he was
expected to attend the meeting, and if he was unable to attend,

he must e-mail his reasons for nonattendance.  Id. at 245:11-18, 246:23-247:20.

Plaintiff never sent the requested e-mail giving Cook plaintiff's reasons for nonattendance, but on July 22, 2002, he did e-mail Cook to inform him that he had retained counsel and all future communication should go through his attorney or AstraZeneca Vice-President Lynne Tetrault.  Pl.'s Dep. 248:12-21. Plaintiff then left AstraZeneca on disability leave and did not return to work until January, 2003.  Pl.'s Aff. ¶ 11.

Plaintiff alleged that depression and anxiety brought on by the stress of the HR investigation and the pending Action Plan rendered him unable to work.  He had been seeing a psychologist, Philip Spivey, intermittently since December, 1999 for treatment of recurring depression and anxiety.  See Spivey Dep. 7:13-8:12, 20:2-7.  Based on his meetings with plaintiff over the years, Dr. Spivey had concluded that plaintiff's depression was symptomatic of his problems communicating and relating to others.  See id. at 34:17-24.

Plaintiff originally saw Dr. Spivey for depression and anxiety related to his familial and personal relationships, but had returned to therapy to discuss problems related to his employment.  Spivey Dep. 20:2-7.  Plaintiff felt "angry," "hurt" and "betrayed" that a "former work ally ha[d] turned on him because of a staffing decision that he . . . made."  Id. at

37:12-14, 40:12-13.  Dr. Spivey reported that plaintiff tended to "take certain things very personally" and referred him to a psychiatrist, Richard Dudley, for medication.  Id. at 61:16-18, 68:13-18.  Plaintiff continued to see Dr. Spivey while on disability leave.  Plaintiff told Spivey he was going on job interviews through December, 2002, while still employed at AstraZeneca.  See id. at 108:10-109:8.

While plaintiff was on disability leave, his psychiatrist submitted an assessment of plaintiff's condition to AstraZeneca at the company's request.  See Pl.'s Ex. D.  In his evaluation, Dr. Dudley determined that plaintiff was suffering from depressive disorder which impaired his concentration, problem-solving ability and interaction with others, but that his prognosis was "good."  See id.

AstraZeneca then requested that plaintiff submit to a "comprehensive Forensic Psychiatric Evaluation" conducted by Dr. Seymour Block.  See Pl.'s Ex. E at 1.  Dr. Block was aware that Dr. Dudley had diagnosed plaintiff with an "Adjustment Disorder with Mixed Anxiety and Depressed Mood," but he disagreed.  See id. at 15-16.  In Dr. Block's opinion, plaintiff was not suffering from a specific mood disorder, "but rather is experiencing depressive symptoms as a result of an identifiable psychosocial stressor in his job environment."  Id. at 16.

Block determined that the Action Plan was the "central

issue" surrounding plaintiff's "disability" and plaintiff's symptoms would likely be alleviated if this "stressor" was removed. See Pl.'s Ex. E at 15, 16. Additionally, Dr. Block felt that plaintiff had an "inflated sense of himself" which caused him to shift the blame onto others. See Block Dep. 19:15-18, 25:9-12. Block also detected some "malingering" in plaintiff's reaction to the Action Plan. See id. at 25:7-12.

Plaintiff returned to work at AstraZeneca in January, 2003, having been on disability leave since the previous June. Cook informed plaintiff that his sixty-day Action Plan would commence on January 17, 2003. Pl.'s Ex. E. Both Marianne Jackson and Ann-Marie McGee reviewed the Action Plan, but Cook alone wrote the Plan and made the decision to place plaintiff on it. Cook Dep. 34:12-23, 36:25-37:6, 40:2-41:4. Cook contends that he never reviewed any medical reports concerning plaintiff's disability leave. Id. at 45:14-16. Although McGee recommended a thirty to forty-five-day Action Plan, Cook decided a sixty-day Plan would be preferable, as it would allow plaintiff more time to improve his performance. See Pl.'s Ex. G; Cook Dep. 44:4-16.

On February 27, 2003, nineteen days before the Action Plan was to end, Cook informed plaintiff that his employment was terminated for "poor performance." Pl.'s Ex. F. According to the termination letter from Cook, plaintiff had completed very few of the required "Action Steps." See id. These failed Action

Steps included: communicate with sales team, set up meetings, prepare requested reports, meet deadlines, submit expense reports, forward requested documents and submit budget tracker. See id. Cook noted that plaintiff "claimed that the Action Plan was too burdensome. However, you spent 9 out of a possible 20 working days at home ostensibly working on the Action Plan, instead of getting out into the field to coach and develop your PSSs." Id.

None of the employees whom plaintiff claims subjected him to racial epithets were involved in the decision to terminate his employment. Only Cook, Jackson, McGee and AstraZeneca counsel Theus McKinney had input on the decision. Cook Dep. 46:18-47:4. Plaintiff admits having no evidence that any of the four decision-makers harbor racist animus against African-Americans. Pl.'s Dep. 273:6-9, 311:17-312:9. Plaintiff contends, however, that Deidre Grayson and John Crooks "conspired this whole thing" so that "Deidre's lover," Valerie Dowell, an African-American woman, could take over his position. Id. at 306:11-15. Additionally, he claims that Jackson is a close friend of Crooks and he believes that Crooks must have been "saying all kinds of things to her." Pl.'s Aff. ¶ 5; Pl.'s Dep. 310:8-11. Plaintiff has no evidence that Crooks ever said anything about him to Jackson, but because of that friendship, he feels Jackson must have "pushed" Cook to terminate plaintiff's employment. Pl.'s

Dep. 309:10-25, 311:7-10.  Plaintiff admits that the only basis for his claim that Jackson "pushed" for his termination was "deduction."  <u>Id.</u> at 309:18-25, 311:11-14.

## Discussion

To prevail on their motion for summary judgment, defendants must prove that no genuine issues of material fact exist and they are therefore entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Issues are considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In a motion for summary judgment, all factual inferences should be drawn in favor of the non-moving party.  <u>E.g.</u>, <u>id.</u> at 255; <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 448 (2d Cir. 1999).  However, allegations "devoid of specifics, but replete with conclusions" will not survive summary judgment.  <u>Bickerstaff</u>, 196 F.3d at 452.

## Title VII Claim

Plaintiff claims that his termination was motivated by race discrimination in violation of Title VII of the Civil Rights Act of 1964.  Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff, an African-American, alleges that his African-American co-workers subjected him to racial epithets, ultimately contributing to his termination by AstraZeneca.  Intra-racial discrimination is actionable under Title VII.  See, e.g., Bland v. New York, 263 F.2d 526, 547 (E.D.N.Y. 2003) (denying motion to dismiss African-American secretary's Title VII claim of race discrimination against her African-American employer); Bryant v. Begin Manage Program, 281 F. Supp. 2d 561, 570 (E.D.N.Y. 2003) (stating that Title VII still applies when black supervisor discriminated against black employee).

Plaintiff's Title VII claim is subject to analysis under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this test, plaintiff must first establish a prima facie case of unlawful discrimination.  Id. at 802.  The burden then shifts to defendants to articulate a legitimate, nondiscriminatory reason for plaintiff's termination.  Id.  Finally, the plaintiff must show defendants' articulated

reason is actually pretext for unlawful race discrimination.  <u>Id.</u>
at 804.


**a.  Plaintiff's <u>Prima</u> <u>Facie</u> Case**

To establish a <u>prima</u> <u>facie</u> case of race discrimination,
plaintiff must show: 1) he is a member of a protected class,
2) he was qualified for his employment position, 3) he suffered
an adverse employment action and 4) it occurred under
circumstances which give rise to an inference of race
discrimination.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.  The
parties agree that plaintiff is a member of a protected class and
that he suffered an adverse employment action (the termination).

Plaintiff has a minimal burden to meet when proving he was
qualified for the position.  He must show only that he "possesses
the basic skills necessary for performance of [the] job."
<u>Slattery v. Swiss Reins. Am. Corp.</u>, 248 F.3d 87, 92 (2d Cir.
2001) (quoting <u>Owens v. N.Y. City Hous. Auth.</u>, 934 F.2d 405, 409
(2d Cir. 1991)).  Although this was plaintiff's first managerial
position, his evaluation shows that plaintiff's performance met
company expectations.  <u>See</u> Cook Dep. 59:13-16; Pl.'s Ex. A.
Additionally, because AstraZeneca hired plaintiff and then
promoted him to this management position, "the inference of
minimal qualification is not difficult to draw."  <u>Slattery</u>, 248
F.3d at 92.  Plaintiff was "qualified" for the DSM position for

the purposes of proving his _prima facie_ case of race
discrimination.

Having satisfied the first three requirements of his _prima
facie_ case, plaintiff now must show that his termination occurred
under circumstances which give rise to an inference of race
discrimination.  See McDonnell Douglas, 411 U.S. at 802.
Plaintiff's claim of race discrimination in his termination
arises primarily from two racist remarks he claims to have
suffered while employed at AstraZeneca.  Defendants argued that
these two racial epithets should not be considered because they
fall outside the 300-day statute of limitations for Title VII
claims.  However, defendants have read the statute of limitations
incorrectly.  Plaintiffs in New York are given 300 days from the
time of the adverse employment action to the time they must file
their complaints with the Equal Employment Opportunity Commission
(EEOC).  Thus, the 300-day statute of limitations does not relate
to the date plaintiff filed his complaint in federal court, but
rather the date he filed his complaint with the EEOC.  See
Pikulin v. City Univ. of N.Y., 176 F.3d 598, 599 (2d Cir. 1999)
(per curiam) (stating that an employment discrimination claim in
New York must be filed with the EEOC within 300 days of the
alleged discrimination) (citing 42 U.S.C. § 2000e-5(e)).
Although the racist remarks did not occur within 300 days of this
date, the defendants' argument fails because the "discrete act"

underlying plaintiff's Title VII claim is his termination, not either of these alleged racist comments. Plaintiff filed his complaint with the EEOC within 300 days of his termination and he is entitled to use untimely facts as background evidence in support his timely Title VII claim. <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002). The racist comments will be considered as background evidence.

Plaintiff mentioned only one racist remark in his complaint, the "Uncle Tom" incident with John Crooks. At plaintiff's deposition, however, he remembered a second racial slur, when Deidre Grayson allegedly called him "nothing more than a nigger with an MBA." <u>See</u> Pl.'s Dep. 284:23-24. Plaintiff's failure to mention this incident prior to his deposition suggests that it is "a convenient and belated afterthought." <u>Regis v. Metro. Jewish Geriatric Ctr.</u>, No. 97-CV-0906, 2000 WL 264336, at *11 (E.D.N.Y. Jan. 11, 2000). However, because all factual inferences are drawn in favor of the non-moving party, this incident will be considered.

Racist comments may constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the termination decision. <u>See</u> <u>Schreiber v. Worldco, LLC</u>, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004). This connection exists if the comments were made by the decision-maker or by someone who had great influence over the decision-maker. <u>Compare</u>

Rose v. N.Y. City Bd. of Educ., 257 F.3d 156, 162 (2d Cir. 2001)
(finding that age-related comments were direct evidence of
discriminatory animus because they were made by a supervisor with
"enormous influence in the decision-making process"), and Kirsch
v. Fleet St., Ltd., 148 F.3d 149, 162-63 (2d Cir. 1998) (citing
Ostrowski v. Atlantic Mutual Ins. Co., 968 F.2d 171, 182 (2d Cir.
1992)) (stating that discriminatory comments were made by
supervisors, not regular employees with no say in the termination
decision, so they do show discriminatory animus), with Griffin v.
Ambika Corp., 103 F.2d 297, 309 (S.D.N.Y. 2000) (finding that it
was "fatal" to plaintiffs' case that they only alleged
discriminatory statements by co-workers, not anyone involved in
the decisions to terminate their employment).

If no such nexus exists, the comments are merely "stray
remarks" which do not lead to an inference of discrimination.
See Schreiber, 324 F. Supp. 2d at 518-19.  The following four
factors are to be considered when determining whether racist
comments are indicative of an intent to discriminate or are just
non-probative "stray remarks": 1) who made the remarks, 2) when
the remarks were made in relation to the termination decision,
3) the content of the remarks and 4) the remarks' context, such
as whether they had any relation to the termination decision.
Id. at 519 (denying defendant's motion for summary judgment when
age-based comments were made by high-level employees just months

17

before plaintiff's termination). Plaintiff claims that the "Uncle Tom" comment was made by two of his subordinates and later relayed to him by a co-worker, John Crooks. Pl.'s Dep. 103:11-13. This does not establish an inference of discrimination. The racial slur, though highly offensive, was made over one year before plaintiff's discharge. See Pl.'s Dep. 91:17-22. Moreover, the statement did not involve any of the termination decision-makers; nor is there evidence to suggest that any of the decision-makers even knew about it.

The second racial epithet incident follows the same analysis. The "nigger with an MBA" comment was allegedly made by a subordinate (Grayson) almost two years before plaintiff's termination. See Pl.'s Dep. 285:9-15. It did not relate in any way to the termination decision and did not involve any of the decision-makers. Even if plaintiff really was subjected to both racial slurs, these isolated incidents do not give rise to the inference that his placement on the Action Plan and his subsequent termination were motivated by racial animus. Although offensive and entirely inappropriate, these comments were "stray remarks" with no demonstrated connection to plaintiff's discharge. See Schreiber, 324 F. Supp. 2d at 518.

Because the alleged comments were not directly linked to anyone involved in plaintiff's termination, plaintiff must show that the offending employees exerted discriminatory influence

over the decision-makers or in some way affected the termination decision.  See, e.g., Rose, 257 F.3d at 162 (comments made by immediate supervisor who did not have authority to fire, but who exerted "enormous influence in the decision-making process" constituted direct evidence of discriminatory animus); Sadki v. SUNY Coll. at Brockport, 310 F. Supp. 2d 506, 513-14 (W.D.N.Y. 2004) ("[T]he element of causation . . . can be satisfied by showing that a person with discriminatory animus toward the plaintiff influenced the 'actual' decisionmaker, even if the latter did not consciously discriminate against the plaintiff."). Plaintiff must show that these co-workers had such influence over the decision-makers that their discriminatory animus can be imputed to the formal decision-makers.  See Sadki, 310 F. Supp. 2d at 513-14.

Plaintiff has failed to articulate such influence with anything more than speculation.  The only connection he makes between the racist comments and the decision-makers is an alleged friendship between Crooks and Marianne Jackson.  See Pl.'s Aff. ¶ 5.  Plaintiff argues that Crooks must have said "all kinds of things" about him to Jackson, causing her to "push" for his termination.[1]  Pl.'s Dep. 310:8-11.  Even if plaintiff could

---

[1] At his deposition, plaintiff articulated an entirely different reason for his termination than alleged in his complaint.  He suddenly claimed that Crooks and Grayson conspired to get him terminated so that Grayson's "lover" could take over his position.  Pl.'s Dep. 306:11-15.  Even if this conspiracy

prove Crooks and Jackson were close friends, he admits having no evidence that these conversations actually took place.  Id. at 309:18-25.  This theory is based entirely on his own "deduction." Id. at 310:8-311:10.  Such "conclusory allegations" of discrimination are insufficient to survive a motion for summary judgment.  See, e.g., Forsyth v. Fed'n Employment and Guidance Serv., 409 F.3d 565, 573 (2d Cir. 2005) ("On a motion for summary judgment in a discrimination case the plaintiff must provide the trial court with more than his own conclusory allegations declaring discrimination was present."); Patterson v. County of Oneida, 375 F.3d 206, 222 (2d Cir. 2004) (holding that plaintiff's conclusory allegations of racial discrimination in his employment termination did not show the existence of a genuine issue of material fact); Ralkin v. N.Y. City Transit Auth., 62 F. Supp. 2d 989, 1001 (E.D.N.Y. 1999) (stating that in order to survive a motion for summary judgment, plaintiff must show "'concrete particulars' to substantiate her claim" (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985))).

Additionally, plaintiff concedes having no reason to believe any of the four termination decision-makers harbor racial animus

---

actually existed, it has absolutely no relation to race discrimination and as such, does not implicate Title VII.  Title VII does not protect employees from any kind of feud that occurs in the workplace.  Plaintiff must actually show some evidence that his termination occurred under circumstances which give rise to an inference of race discrimination.  See McDonnell Douglas, 411 U.S. at 802.

against African-Americans.  Pl.'s Dep. 273:6-9, 311:17-312:9.
Although plaintiff is not required to prove that all of the
decision-makers, or even a majority of them, are biased against
his race, he would need to show this bias in at least one of
them, whether due to their own views or the discriminatory
influence of others.  See Jalal v. Columbia Univ., 4 F. Supp. 2d
224, 238 (S.D.N.Y. 1998) (noting that a Title VII plaintiff is
not required to show invidious discrimination in each member, or
even the majority, of the decision-making group).  Plaintiff has
not shown this bias to exist in any of the decision-makers.

If plaintiff himself cannot articulate evidence of racial
discrimination in his termination, no reasonable jury could
possibly find it.  Plaintiff has failed to produce evidence
showing a prima facie case of race discrimination, so defendants'
motion for summary judgment on the Title VII claim is granted.

**b.   Defendants' Legitimate, Nondiscriminatory Reason**

Plaintiff has not established a prima facie case of race
discrimination, as required by the first step of the McDonnell
Douglas test.  Thus, the burden does not shift to the defendants
to rebut any inference of discrimination with a legitimate,
nondiscriminatory reason for plaintiff's termination.  However,
even assuming, arguendo, that plaintiff had established a prima
facie case, defendants would still prevail because they have

established that they had a legitimate reason for terminating plaintiff.

Plaintiff's problems managing people are well documented, both in complaints from his co-workers and in his psychological and psychiatric evaluations. AstraZeneca felt that these problems could best be corrected through a supervised Action Plan. A business decision such as this will not be questioned so long as it does not mask invidious discrimination. <u>See</u>, <u>e.g.</u>, <u>Byrnie v. Town of Cromwell, Bd. of Educ.</u>, 243 F.3d 93, 103 (2d Cir. 2001) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." (quoting <u>Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1330 (10th Cir. 1999) (internal quotation marks omitted))).

Plaintiff's manager Cook clearly outlined what was expected of plaintiff under the Action Plan. <u>See</u> Pl.'s Ex. E. Cook also clearly documented plaintiff's failure to perform under the requirements of the Action Plan. <u>See</u> Pl.'s Ex. F. Plaintiff completed so few of the Plan's "Action Steps" that one can safely assume he put forth no effort. <u>See</u> <u>id.</u> Plaintiff's numerous problems performing his job adequately and his absolute refusal to improve his performance under the Action Plan provide legitimate, nondiscriminatory reasons for his termination.

**c.  Plaintiff's Proof of Pretext**

Assuming again, <u>arguendo</u>, that plaintiff had established his <u>prima</u> <u>facie</u> case of Title VII race discrimination, which he has not, and accepting that defendants have articulated their legitimate, nondiscriminatory reason for his termination, the burden would next shift back to plaintiff.  He would be required to show that the defendants' "legitimate" reason for his discharge was actually pretext for unlawful discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 804.

Plaintiff appears to argue that defendants' asserted reason must be pretext because he performed his job adequately, as evidenced by his evaluation and Sales Value Proposition Award. <u>See</u> Pl.'s Ex. A; Pl.'s Ex. B.  Just because an employee has received positive evaluations in the past does not mean that his termination was a pretext for discrimination.  <u>See</u>, <u>e.g.</u>, <u>Patterson</u>, 375 F.3d at 213 (finding that summary judgment on this Title VII claim was appropriate even when plaintiff had received a positive evaluation just over a week before he was terminated).

As Cook mentioned in his deposition, much of plaintiff's evaluation reflects the performance of his entire sales team, not just the plaintiff himself.  <u>See</u> Cook Dep. 60:3-61:13.  Of the six goals where he "exceeded" expectations, four of them dealt with sales figures, which reflect the effort of the whole team. <u>See</u> Pl.'s Ex. A; Cook Dep. 60:3-61:13.  Thus, plaintiff's

evaluation is not exclusively indicative of his personal performance; his PSSs' strong sales figures helped plaintiff "exceed" the financial goals. These strong sales figures probably also explain plaintiff's award. Although plaintiff refers to it as simply the "Value Proposition Award," his own exhibit B shows it to be the "Sales Value Proposition Award," which presumably has some relation to his team's financial success. See Pl.'s Aff. ¶ 1, ¶ 9; see also Pl.'s Ex. B.

Plaintiff also claims that, based on his experience at AstraZeneca, an "Action Plan" is really just a euphemism for "managing someone out of the company." Pl.'s Aff. ¶ 9. However, plaintiff contradicts this assertion in his deposition when he admits that one of his subordinates successfully completed the Plan. See Pl.'s Dep. 138:12-14, 140:3-12. At his deposition, Cook mentioned several employees who were even promoted after completing Action Plans. See Cook Dep. 69:16-22. Judging from this evidence, it is apparent that an AstraZeneca Action Plan is not just a euphemism for "managing someone out of the company." Plaintiff claims that the Action Plan was "designed for [him] to fail," but nothing in the Plan suggests that it was unreasonable or overly burdensome and plaintiff points to nothing to suggest otherwise. See Pl.'s Aff. ¶ 11; Pl.'s Ex. E. Finally, even if plaintiff claims the Action Plan was pretext to terminate him, plaintiff offers no evidence that would permit the inference that

24

this action was based on his race, rather than some personal agenda or his work deficiencies.

In addition, AstraZeneca benefits from the "same actor" inference. Jeff Cook was primarily responsible for hiring, promoting and then terminating plaintiff. Cook was obviously aware that plaintiff was African-American when he hired him and when he promoted him. Cook Dep. 63:5-10. It would be unlikely for Cook to have hired and promoted plaintiff, knowing of his race, and then fired him because of it. See Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997) (stating that when the same person made the decision to hire and made the decision to fire, this "strongly suggest[s] that invidious discrimination was unlikely"); Ralkin, 62 F. Supp. 2d at 1000; Roman v. Cornell Univ., 53 F. Supp. 2d 223, 236 (N.D.N.Y. 1999).

Plaintiff has not shown that defendants' legitimate, nondiscriminatory reason for his termination - his poor performance - is pretext for unlawful discrimination. Not only do plaintiff's sales award and performance evaluation largely reflect the efforts of his team, but such positive feedback alone is not enough to rebut defendants' legitimate, nondiscriminatory reason for his termination. Additionally, because the same person was responsible for hiring and firing plaintiff, this "strongly suggests" that racial discrimination was not the reason for plaintiff's termination. Plaintiff has provided insufficient

proof of pretext when faced with overwhelming evidence that he failed to perform his job adequately, get along with his co-workers and follow the Action Plan's requirements. <u>See</u> <u>Ralkin</u>, 62 F. Supp. 2d at 997 ("When an employer provides convincing evidence explaining its conduct, and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact and grant summary judgment to the employer.").

Plaintiff has failed to establish even his <u>prima</u> <u>facie</u> case of race discrimination, much less that defendants' reason for firing him was pretextual, so defendants' motion for summary judgment on the Title VII claim is granted.


### (2)

### Intentional Infliction of Emotional Distress

Plaintiff maintains that AstraZeneca knew the Action Plan would cause him emotional distress, but chose to place him on it anyway. New York law has a strict standard for an intentional infliction of emotional distress claim. Plaintiff is required to prove: 1) extreme and outrageous conduct, 2) intent to cause, or disregard of the substantial probability of causing, severe emotional distress, 3) a causal connection between the conduct and the injury and 4) severe emotional distress. <u>Howell v. N.Y.</u>

<u>Post Co.</u>, 81 N.Y.2d 115, 121, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350, 353 (1993).  Plaintiff cannot sustain this burden as a matter of law at least as to the first two elements.

Even assuming that AstraZeneca's agents knew the Action Plan would exacerbate plaintiff's depression and anxiety, this action is far from "extreme" or "outrageous."  Surely, being placed, in effect, on probation is anxiety-producing, but under New York law, the conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  <u>Murphy v. Am. Home Products Corp.</u>, 58 N.Y.2d 293, 303, 448 N.E.2d 86, 90, 461 N.Y.S.2d 232, 236 (1983) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)); <u>see also</u> <u>Howell</u>, 81 N.Y.2d at 122, 612 N.E.2d at 702, 596 N.Y.S.2d at 353.  Attempting to improve an employee's performance through a supervised program is far from "atrocious."  These plans are necessary for the company and often beneficial to the struggling employee.  Rather than face immediate discharge, employees are given step-by-step instructions on how to improve their performance.

Companies have the right to place employees on performance improvement plans at their discretion.  Plaintiff cannot bring an intentional infliction of emotional distress claim absent "deliberate reprehensible conduct" by AstraZeneca in discharging

this right.  <u>Howell</u>, 81 N.Y.2d at 125, 612 N.E.2d at 705, 596
N.Y.S.2d at 356.  This is true even if AstraZeneca knew the
Action Plan would distress plaintiff, as it no doubt would any
employee.  <u>Id.</u> at 125-26, 612 N.E.2d at 705, 596 N.Y.S.2d at 356
("The actor is never liable . . . where [the actor] has done no
more than to insist upon his [or her] legal rights in a
permissible way, even though he [or she] is well aware that such
insistence is certain to cause emotional distress." (quoting
Restatement (Second) of Torts § 46, cmt. g (1965))).

Plaintiff also cannot establish that AstraZeneca intended to
cause him emotional distress, as required under New York law.  He
cannot prove that the company's agents intended or even knew the
Action Plan would distress him to the extent he now claims.
Plaintiff claims that an e-mail communication among Cook, Jackson
and McGee establishes that they were all aware of his condition.
Jackson's e-mail, sent while plaintiff was preparing to return
from disability leave, stated "[w]e need to provide a safe
environment for [plaintiff] to come back to."  Pl.'s Ex. G.  At
first blush, it would appear that his supervisors were trying to
be helpful, considering plaintiff had been out on disability
leave for approximately seven months.  At most, all this e-mail
shows is that they knew plaintiff was suffering distress, not
that they, as plaintiff interprets it, intended to cause it.  A
jury verdict that accepted this interpretation could not be

sustained.

Without access to Dr. Block's report, AstraZeneca's agents had no way of knowing that the pending Action Plan was the main cause of plaintiff's "disability."  Cook asserted in his deposition that he ultimately made the decision to place plaintiff on the Action Plan.  See Cook Dep. 34:13-23.  Cook was aware that plaintiff was on "short-term disability" leave, but maintains that he never saw plaintiff's psychological evaluations, pursuant to AstraZeneca's confidentiality policy regarding medical information.  See id. at 45:10-16, 66:15-24. Because plaintiff cannot establish that Cook knew the Action Plan would cause him emotional distress, he cannot prove that AstraZeneca intended to cause him this distress or even disregarded the substantial probability of this result.  As noted, the reasonable interpretation of the e-mail actually shows that AstraZeneca tried to prevent plaintiff from suffering any more distress.

Finally, it is not clear that plaintiff's depression meets the level of severity required under New York law for an intentional infliction of emotional distress claim.  Putting aside the "comprehensive Forensic Psychiatric Evaluation" by the defendants' expert, Dr. Block, who detected some malingering in plaintiff's exaggerated response to the Action Plan, see Block Dep. 25:7-12, plaintiff's regular psychologist even noted that

plaintiff's mood was "improved" while he was on the Action Plan and that he seemed primarily concerned with issues in his personal life at this time.  <u>See</u> Spivey Dep. 115:6-11.  Thus, although the Action Plan likely worsened plaintiff's preexisting depression and anxiety, his own doctor establishes that the distress plaintiff suffered was not sufficiently severe.  <u>See</u> <u>Bujnicki v. Am. Paving and Excavating, Inc.</u>, No. 99-CV-646S, 2004 WL 1071674, at *15 (W.D.N.Y. Mar. 30, 2004) (holding that plaintiff's depression was not sufficiently "severe" when her treating physician felt plaintiff was just a "very sensitive person" who was overwhelmed with her present situation).

For these reasons, defendants' motion for summary judgment on the intentional infliction of emotional distress claim is, therefore, granted.


**(3)**

**Defamation**

Plaintiff's defamation claim against Deidre Grayson stems from what he claims are her "knowingly false" allegations that he violated AstraZeneca's nonviolence policy.[2]  Throughout this

---

[2]  It should be noted that the one-year statute of limitations had passed before this defamation claim was filed. However, defendants failed to raise this affirmative defense in their responsive pleadings and it will not be raised <u>sua</u> <u>sponte</u>. <u>See</u> <u>Davis v. Bryan</u>, 810 F.2d 42, 44 (2d Cir. 1987) (explaining that district courts in civil actions should "ordinarily" not raise statute of limitations violations <u>sua</u> <u>sponte</u>).

litigation, plaintiff has articulated no fewer than three
separate motives for Grayson's alleged behavior. He originally
claimed that Grayson wanted him terminated as part of a racist
conspiracy involving John Crooks. See Compl. ¶ 3. Then
plaintiff maintained Grayson wanted him fired because he did not
recommend her requested transfer. See Pl.'s Br. Opp'n Defs.'
Mot. Summ. J. at 5. Finally, at his deposition, plaintiff
alleged that Grayson instigated his discharge so that her "lover"
could take over his position. Pl.'s Dep. 306:11-15. Plaintiff
has failed, however, to substantiate any of these motives.

Under New York law, a qualified privilege protects
communications made in good faith regarding a common interest
shared between the parties, even if this communication would
otherwise be defamatory. Hoyt v. Kaplan, 263 A.D.2d 918, 919,
694 N.Y.S.2d 227, 229 (3d Dep't 1999) (noting that it is without
dispute that a qualified privilege protected real estate broker's
defamatory communications to fellow members of a real estate
organization); Grier v. Johnson, 232 A.D.2d 846, 847, 648
N.Y.S.2d 764, 766-67 (3d Dep't 1996) (holding that police
officer's communications to plaintiff's employer were protected
by qualified privilege). This "common interest" privilege "may
well" apply to fellow employees when communicating information
regarding their employment. See Loughry v. Lincoln First Bank,
N.A., 67 N.Y.2d 369, 376, 494 N.E.2d 70, 73, 502 N.Y.S.2d 965,

968 (1986).  Because Grayson's statements dealt with an
employment issue and she told only the proper internal parties at
AstraZeneca, defendants have shown that Grayson's communications
are covered by this qualified privilege.

However, the shield of privilege will not protect these
communications if plaintiff can show Grayson spoke with malice.
See Liberman v. Gelstein, 80 N.Y.2d 429, 437, 605 N.E.2d 344,
349, 590 N.Y.S.2d 857, 862 (1992).  Either the constitutional or
common law standard of malice can defeat the qualified privilege,
but plaintiff has failed to produce evidence which satisfies
either standard.  See id. at 438, 605 N.E.2d at 350, 590 N.Y.S.2d
at 863.

To satisfy the constitutional, or "actual" malice standard,
plaintiff must show that Grayson made the statements with a "high
degree of awareness of their probable falsity."  Id., 605 N.E.2d
at 350, 590 N.Y.S.2d at 863 (quoting Garrison v. Louisiana, 379
U.S. 64, 74 (1964)).  Although plaintiff argues that Grayson's
allegations were "knowingly false," he essentially concedes the
factual basis underlying her complaint.  Plaintiff admits to
touching co-workers' forearms when seeking their attention and
also admits that he once stared at Grayson at the end of a
"contentious" meeting.  Pl.'s Dep. 293:3-8, 298:8-12.  He argues,
however, that Grayson purposely mischaracterized the nature of
his conduct.  Plaintiff maintains his behavior was not

threatening or violent.  <u>See</u> <u>id.</u> at 296:5-14.

Because plaintiff concedes the factual basis of Grayson's allegations, all he really objects to is her perception of this conduct (that it was harassing or threatening).  New York law recognizes that the public interest is best served by shielding from liability those communications where "the good that may be accomplished by permitting an individual to make a defamatory statement without fear of liability . . . outweighs the harm that may be done to the reputation of others."  <u>Garson v. Hendlin</u>, 141 A.D.2d 55, 61, 532 N.Y.S.2d 776, 780 (2d Dep't 1988).  If an employee honestly feels that a co-worker is subjecting him or her to threatening or otherwise inappropriate behavior, that employee should be encouraged to file a complaint with the company.  Such communication will therefore not subject the reporting employee to liability absent evidence of an improper motive.  Unless Grayson purposely mischaracterized plaintiff's conduct, her communication with HR and plaintiff's supervisor is privileged.

Defendants have offered evidence which supports Grayson's perception of plaintiff's behavior.  In or around 1999, he was involved in a physical altercation with another co-worker, which had to be broken up by other employees.  Pl.'s Dep. 299:2-300:14. Additionally, plaintiff's psychologist reported that plaintiff had anger management issues.  Spivey Dep. 116:14-117:5.

Plaintiff has failed to produce sufficient evidence

suggesting that Grayson acted with actual malice.  Alternatively,
the common law standard of malice requires plaintiff to show that
Grayson made the defamatory statements solely out of spite or ill
will.  <u>See</u> <u>Liberman</u>, 80 N.Y.2d at 439, 605 N.E.2d at 350, 590
N.Y.S.2d at 863; <u>see</u> <u>also</u> <u>Golden v. Stiso</u>, 279 A.D.2d 607, 608,
720 N.Y.S.2d 164, 165 (2d Dep't 2001).  Plaintiff has suggested a
wide variety of motivations behind Grayson's statements, but in
order to prove that Grayson acted with common law malice, he must
show that ill will was her only motivation for reporting his
behavior.  Grayson and the AstraZeneca parties to whom she
reported plaintiff's behavior all shared a common interest in
ensuring a safe work environment.  Even if Grayson disliked
plaintiff, which a reasonable jury could conclude based on the
evidence, this does not mean she lost her privilege to
communicate information which affected her employment interests.
<u>See</u> <u>Liberman</u>, 80 N.Y.2d at 440, 605 N.E.2d at 351, 590 N.Y.S.2d
at 864 ("If the defendant's statements were made to further the
interest protected by the privilege, it matters not that
defendant <u>also</u> despised plaintiff.").

Thus, even if Grayson did report plaintiff's conduct at
least partially out of spite, her communications are protected by
the "common interest" privilege and plaintiff has failed to
produce evidence showing that Grayson abused this privilege by
acting with malice.  That is to say, although plaintiff has

articulated ulterior motives which may have motivated Grayson to
file these allegations, he cannot establish that her complaints
were "knowingly false" since he does not dispute the factual
basis for the allegations.  Accordingly, defendants' motion for
summary judgment on the defamation claim is also granted.


## Conclusion

For the foregoing reasons, defendants' motion for summary
judgment is granted on all claims.  The Clerk of the Court is
directed to close the case.


Dated:      Brooklyn, New York
            August 16, 2006

                              SO ORDERED:

                              _____/s/_____
                              David G. Trager
                              United States District Judge

35